# B. W. Payne & Sons, to Use, etc., Plffs. in Err., *v.* John J. Noon et al.

### Same *v.* Same.

### Same *v.* Same.

A mere omission to refer, in charging a jury, to all the evidence is not ground for reversing a judgment.

Cross-examination must be confined to matters which have been stated in the direct examination. A party will not be permitted to lead out new matter, constituting his own case, by cross-examination of his adversary's witnesses.

The admission or rejection of so-called expert testimony is a preliminary question, within the discretion of the court below; and unless it appears that the discretion was abused, its exercise is not ground for reversal.

In an action to recover the price of machinery warranted to do specified work, but proved incapable, the plaintiff is only entitled to the price, less the difference between the value of the machinery furnished and the value of the machinery contracted for.

(Argued February —, 1887.   Decided February 28, 1887.)

January Term, 1886, Nos. 229, 230, and 231, E. D.   Error brought by plaintiffs to the Common Pleas of Lycoming County to review judgments on verdicts for the plaintiffs for less amounts than claimed in actions of debt.   Affirmed.

The following are the facts as stated by the plaintiffs in error:

In August, 1883, the plaintiffs, B. W. Payne & Sons, were manufacturing steam engines at Elmira, New York.   About this time the defendants, John J. Noon and Frank Kane, residing in Lycoming county, Pennsylvania, opened negotiations with Payne & Sons for the purchase of a portable engine, boiler, and sawmill machinery, the consideration for which they desired

NOTE.—For the duty of the court to charge upon the evidence, see note to Frothingham v. Laflin & R. Powder Co. 8 Sad. Rep. 29.

For the measure of damages for breach of contract, see note to Philadelphia & R. Coal & I. Co. v. Hoffman, 1 Sad. Rep. 405, and Mobley v. Morgan, 8 Sad. Rep. 105.

to pay in instalments of one, two, and three years. Payne & Sons did not desire to give this time, and wrote George O. Holcomb and E. Pomeroy, of Troy, Pa., requesting them to purchase the paper without recourse, if the contract could be closed.

Holcomb and Pomeroy, after investigating the financial standing of the defendants, agreed to take the paper. Several interviews were had between Payne & Sons, Holcomb, and defendants, the negotiations resulting, in September, 1883, in the defendants giving the order for one 25-horse portable engine, a No. 2 sawmill, 56-inch saw, 60 feet of 12-inch belt, iron for two cars, one shaft, boxes and pulleys for jack mill, engine and mill to be complete, small pulley to drive jack wheel, for which defendants were to pay $2,200 in three equal annual payments, machinery to be delivered on the cars on or before October 15, 1883.

A printed warranty was attached to the order which Payne & Sons delivered to defendants. B. W. Payne & Sons represented to the defendants that an engine of this size would have sufficient power to cut from 10,000 to 15,000 feet of inch boards in ten hours; and also that the engine would furnish power to run a jack mill, cut-off saw and edger; but that if they ran these at the same time they were sawing it would not cut the above amount of lumber.

October 13, 1883, Payne & Sons sent defendants three judgment notes, payable in one, two, and three years, which notes defendants executed and returned Payne & Sons, who assigned them to Holcomb and Pomeroy, who entered said notes in the court of common pleas of Lycoming county. On receipt of the above notes Payne & Sons shipped the engine and boiler, of their own manufacture, and a Moravian sawmill No. 2, purchased by them of the Moravian Iron Company, of Moravia, New York, and the other articles included in the order. Payne & Sons sent an experienced machinist, who set up the engine and mill and operated the machinery for part of two days.

In February, 1884, defendants complained to Payne & Sons that the engine did not develop the capacity it was represented to have. Payne & Sons sent Heath, an experienced machinist, to examine the engine and ascertain what the trouble was. He found an automatic governor stuck fast from improper lubrication, which he loosened, when the engine developed its full capacity when working in the knottiest logs that could be selected

by the defendants. The defendants expressed themselves as entirely satisfied with the running of the machinery, after a two days' test, and gave Heath a letter to that effect to Payne & Sons.

In June, 1884, Noon, one of the defendants, went to Elmira and complained to Payne & Sons that the engine only had the capacity to cut 10,000 feet of inch boards in ten hours. Payne & Sons sent an experienced machinist to test the engine with an "indicator." He made the test while the engine was working, and took the proper cards therefrom, which were produced in court and worked out by experts, showing that the engine had a capacity of fully 40-horse power.

August 26, 1884, defendants wrote to Holcomb and Pomeroy, asking an extension of the time of payment of the note which came due October 15, 1884, for a period of three or six months, saying that at the present time they could not sell their lumber to advantage.

October 10, 1884, defendants made an application to the court of common pleas of Lycoming county to open the three judgments entered against them by the plaintiffs, alleging failure of consideration because the engine did not have the capacity represented by Payne & Sons.

December 3, 1884, Holcomb, by direction of Payne & Sons, proposed to Noon, one of the defendants, that if they would permit the plaintiffs to take a crew of men and run the machinery sold, and the engine did not prove to have the capacity represented, Payne & Sons would take it back, cancel the judgments, and pay all costs. Noon rejected this offer because they were about to move the machinery, and was told that the offer would hold good after the machinery was moved. This proposition was never accepted by the defendants.

On June 17, 1885, the judgments were opened.

Other facts appear by the charge of the court below.

Philip Miller, a machinist and mechanical engineer, called by the defendants as an expert to prove that the engine furnished by the plaintiffs did not possess the capacity represented, was examined as to the construction, operations, and practical workings of the engine, and was then asked its value. On cross-examination, the plaintiffs asked him the following question:

"Suppose that the difficulty in the engine was the opening and closing of the ports, for the admission of steam, was that a matter easily remedied, at slight cost?"

Defendants' counsel objected that this was not cross-examination, and for the reason it had been shown to be the contract between the parties that the plaintiffs should put the engine in proper order. Objection sustained. First assignment of error.

G. F. Wilcox, a witness for the plaintiffs, was asked on direct examination:

"From your experience as a practical sawyer, will a 25-horse power engine cut from 10,000 to 15,000 feet of hemlock boards in ten hours?"

Defendants' counsel objected to the question, for the reason that the only engine the witness had sworn that he used was one differing in size from that used by the defendants, and the witness had not proven himself qualified as an expert to show what amount of lumber a 25-horse power engine would cut. Objections sustained, and witness excluded as an expert. Second assignment of error.

Counsel for plaintiff offered to prove by this witness that he had had experience of from three to five years in using the No. 2 Moravian mill, sawing hemlock boards with an engine of less than 25-horse power; and proposed to ask him whether an engine used with a No. 2 Moravian mill, with 25-horse power, would furnish sufficient power to run that mill to cut from 10,000 to 15,000 feet of hemlock boards in ten hours, the plaintiff having already shown this engine in use by Noon & Kane to have more than 25-horse power.

Defendants' counsel objected:

First, because the witness had not been shown by any preliminary examination to have any knowledge as to what horse power is, or any knowledge whatever that would qualify him as an expert to answer the offer.

Second, because the only engine and the only mill that the witness ever ran, so far as appears in the offer or his preliminary examination, was an engine with an eight by ten cylinder; and he was not qualified by reason of running such a mill to speak of the capacity of a nine by twelve engine running under different conditions, with a boiler, engine, and mill that he had never seen and knew nothing about.

Third, because the evidence was irrelevant and incompetent. Objections sustained. Third assignment of error.

CUMMIN, P. J., charged the jury as follows:

The issues which you have been sworn to try arise in three

cases,—three judgments, that were entered in this court in favor of B. W. Payne & Sons, for the use of George Holcomb and E. Pomeroy, against John J. Noon and Frank Kane. These judgments had been entered on three judgment notes. Some time after they were entered the defendants made application to the court, setting forth that the consideration had failed, in whole or in part, for these notes, and that the plaintiffs ought not to be entitled to collect them. Some testimony was taken on this matter, and the judgments were opened in order to give the defendants opportunity to show their position; and that is the question which now comes before you,—whether Noon & Kane have any defense to this claim in whole or in part.

The circumstances under which these notes were given are substantially about as follows: Noon and Kane are two young men living in this county, who, in the summer of 1883, desired to go into the lumber business, and for this purpose desired to purchase a portable sawmill. They heard of the mills of Payne & Sons, the plaintiffs here, and a man named Holcomb came to see them. He lives in Troy, between where the defendants live and the plaintiffs live. Some negotiations had been had between them through this man Holcomb, and Holcomb had called on the Paynes after he had a conversation with the defendants. Some catalogues had been exhibited to Noon & Kane,—catalogues of the machines,—which described them and the work they were supposed to do. The defendants were starting in the sawmill business and knew nothing about portable steam sawmills, and in their conversation with these parties told them they knew nothing about horse power. These mills were recommended to them as mills that would cut from 10,000 to 15,000 feet of 1-inch boards per day. This was what Noon & Kane wanted to buy, and the plaintiffs recommended that this machinery would do that amount of work.

At first Noon & Kane thought of purchasing an engine and mill of smaller size, but, on being assured that they would not be able to do the amount of work that was required, they concluded to take the larger size, and finally a bargain was struck. They were to furnish this portable steam sawmill, and the defendants were to pay $2,200, which was the catalogue price.

Among other matters discussed in the negotiations was the question of time the defendants should have to pay this debt, which they alleged they were unable to pay down, and would

have to have time. It seems that Payne & Sons were unable to give time themselves, but made arrangements with Holcomb and Pomeroy to take the notes without recourse, and they to furnish the machinery in that way, and they to furnish Payne & Sons the money. All this occurred in July and August, 1883, and in September, as nearly as we can get at it, the bargain was concluded. The bargain was concluded in September, although the papers are not dated at the time they were executed. At this time an order was signed by John J. Noon and Frank Kane, which will go out with you; and it appears that attached to this order was what is known as a warranty, signed by Payne & Sons. Noon & Kane signed the order and Payne & Sons gave them the warranty. These papers will be out with you.

Now, ordinarily, when parties negotiate about anything and finally come to a conclusion and put it in writing, they sign papers and pass them to each other; when that is the whole transaction the presumption is the parties have put in writing the whole of their contracts. There are exceptions to this; and notwithstanding the papers are written and printed, yet either party is permitted to show such things,—as the declarations and agreements,—as induced the other party to sign. If there is anything omitted from the papers, and if it is proven to the satisfaction of the jury by clear and satisfactory proof, then they consider it also as part of the agreement, although not written in the papers. This order you will find calls for the delivery of the machinery on or about the 15th of October.

In addition to what the warranty says, or if there had been no warranty, the parties were bound to furnish the machinery made in a good, workmanlike manner. That is implied. In this case it is part of the contract that the machinery be of good material and workmanship.

Now, after these papers were passed from one to the other, on the 5th of October, Payne & Sons sent to Noon & Kane three notes, which they asked them to sign. These three notes amounted to $2,200, and they were required to sign these notes and return them before the machinery would be shipped. This they did. The defendants signed the notes and returned them. These notes will be in evidence before you. The total amount is $2,200. Afterwards the machinery was shipped to Noon & Kane, and in November a man was sent by Payne & Sons to put up the mill for these parties,—the engine and mill. This

man, Conlon, came down and put up the mill and started it. There was no considerable amount of work to be done during the fall,—not much sawing until the following spring, when the sawing season began.    There was some work done of a small amount.

[In March, 1884, when the defendants had acquired their stock of logs for the season Mr. Heath was sent down,—complaints having been made about the engine not being what it was to be,—to see what could be done.    He made some repairs or adjustments that seemed to make the engine run better.    But it is claimed by the defendants that at no time would it do the amount of work that it was guaranteed to do, and that they had by their agreement a right to claim that it should do.]

In June, about the middle of June, Mr. Holcomb writes a letter which to some extent states the situation; he says:

"Mr. Kane has had a talk with me in regard to the engine. He claims that he has had a master mechanic from Williamsport, and he pronounced the engine not able to do the work we represented, and is willing to pay for your man's time and expenses, if you will go there and test the mill and find that the fault is in him.    If you can get the power out that was represented, he will be satisfied.    If it cannot be done, he wants you to give him an engine that will do what we represented.    He seems to be reasonable."

This letter is dated the 9th of June.    About the middle of June,—shortly after the time this letter passed,—this man Coleman went to the mill and made tests of the machinery which have been given in evidence before you.    He had with him an indicator and he put that on the engine, and he has furnished here the cards taken by the indicator, from which the conclusions have been based which they have given before you.

Before this time, in August, 1884, there was a letter written by Noon & Kane to Holcomb, in which they request him to defer the paper.    That was in June the last paper was passed and after Coleman went there to make his examinations in August. After that one of the defendants writes to Holcomb asking for further time.    That letter will be out with you.

[There is another paper in evidence, which Noon & Kane gave Heath when he was there in 1884; and in regard to that paper, the evidence is that it was given to him as a puff to himself personally.]    This paper will also be out with you.

A number of witnesses have been called before you tending to show the capacity of this engine. It is claimed here by the defendants that this engine was not what it was represented. They claim before you that these judgments ought not to be paid, either in whole or in part, because the engine furnished in this case, the machinery furnished, did not and would not do the work it was represented it would do. And so testimony was produced on one side and the other tending to show this particular state of facts.

The evidence produced by the defendants here tends to show that this mill would not cut more than 6,000 feet per day of inch boards; and the evidence of the other party showing that the engine possessed the power,—did possess the power,—to do the whole amount of work which it was represented it would do.

Now just here I may call your attention to another matter. While it was the duty of Payne & Sons to furnish the machinery which they represented, the machinery made in a good and workmanlike manner, on the other hand when that machinery passed to Noon & Kane it was their duty to operate it in a good and workmanlike manner. They could not by their negligence, or carelessness, or ignorance of the manner of running the machinery put this machinery in such a shape it would not do the work, and then claim that as a defense. If the machinery, improperly run, would not do its work by reason of the negligence of the defendants, or their ignorance or carelessness, that is not a good defense. It must be the want of power in the thing itself when properly run and managed.

That is a brief description of the circumstances of this case, and now you come to the real questions, and the first question will be: What was the contract between the parties? What was the warranty in this case? This machinery has been paid for by these notes, the whole amount of the consideration. Now what was the warranty? What did Payne & Sons guarantee this machinery would do? As I said before to you, where parties have put their agreements in writing they are bound by them; but there are exceptions to the rule, where it can be shown things are omitted which induced one party or the other to sign. If these things are produced by satisfactory evidence, the jury may consider them. Then this warranty that was passed from one to the other in this transaction contains nothing of the amount of work this mill should do, and therefore the defendants called

witnesses to show that in addition to what is contained in the warranty they were induced to sign this paper by the representation that this mill was to cut from 10,000 to 15,000 feet of lumber, board measure, in ten hours. Noon & Kane claim that by the warranty it was to cut from 10,000 to 15,000 feet of inch boards in ten hours, and would have sufficient power to run an edger, cut-off, and jack wheel.

Payne & Sons claim, or some of the witnesses testified in regard to it, that this mill was not to run these additional things at the same time, but that it would cut the 10,000 to 15,000 feet per day. If they were running the saw, it would not run the other things in addition to it, but would have power to run them separately. Then Payne & Sons claim that what they agreed to furnish was an engine with sufficient power to cut from 10,000 to 15,000 feet per day of inch boards.

The other side claim it was to cut that amount. There is some difference in the wording, and yet not very much, because if the machinery (there is no complaint of the sawmill) and the engine had that power, then of course it could do it, and would do it if properly managed. On the other hand the defendants claim that the plaintiffs warranted that it would cut from 10,000 to 15,000 feet in ten hours. That means if it was properly managed. So there is but little difference in that respect.

The first thing then that you will endeavor to ascertain will be: What was the contract between the parties? What did Payne & Sons warrant this mill would do? What was the power of the mill they were selling, and what power did they guarantee or warrant? After you have ascertained what that contract was, then you next inquire, Has there been a breach? Is the machinery what it was warranted to be? If it is, then, of course, there is no defense, and the verdict would be for the plaintiffs. If, however, this machinery is not of the power it was warranted to be, or will not do the work, then it will be your duty to ascertain the extent of the damages that the defendants have suffered by reason of the mill not being what they were entitled to have it.

The plaintiffs claim there is no breach of the warranty at all, taking the warranty in its fullest extent; that the mill is all it was warranted to be, all the horse power necessary to do this amount of work. On the other hand the defendants claim whether it has the power or not it will not do the work at all, and

will cut but 6,000 or 8,000 feet in ten hours. Now if this mill will not do the work it was required to do, warranted to do, then what is the amount of damages that the defendants have sustained? Because, whatever that amount is, it would be proper to deduct one third from each of these judgments, and reduce the claims to that extent.

And just here comes a rule of law which will be your guide in ascertaining this damage. Here was a contract between two parties to furnish a portable sawmill. The plaintiffs furnished the mill, and the defendants find that it will not do the work awrranted to do. Assuming this to be the fact, suppose the defendants find that the machinery will not do the work it was intended to do, then what amount of damage do they sustain? Now if they are permitted to show how much they lost from day to day they might continue for an indefinite number of years, and not only wipe out the claim of the plaintiffs but put them in dcbt. Then on the other hand, suppose they had furnished machinery worth only half as much as they ought to have furnished, and the next day it was destroyed by fire, then if the rule of damages was to be the amount they would lose from day to day such rule would be unjust to the defendants. On the one hand it might produce entirely too much, and on the other hand would not give the defendants enough. Then another rule must be looked after. It is this and is clearly stated in the books: When Noon & Kane discovered this sawmill would not do the work warranted, there were two things they could do: they could refuse to keep the machinery and notify Payne & Sons, "your machinery does not do the work represented and we will not keep it. We will hold it subject to your order and return it;" signifying their intention not to have it at all. And they might then recover damages for not furnishing the right machinery in time. That was one of the things they could do.

Another thing would be to keep the machinery, and claim damages for the difference between the machine which they got and the machine which they bargained for. That is the rule which applies in this case. The defendants did keep the machinery and are claiming damages for the difference in value, which we say is the difference in value of the machinery they got and that which they ought to have had. That is the rule which we direct you to follow in ascertaining the damages in this case.

When Noon & Kane decided to keep this machinery instead

of returning it, they then made themselves liable to pay just what this machinery is worth which they kept. They were not required to keep it at all. They could send it back or send to Payne & Sons to come and take it back. But when they kept it, they signified their intention to pay for it; and as plaintiffs had their notes they might have had them reduced by showing the extent of their damages.

[Now then you follow this down, and if you find first what the contract is, then inquire next whether there was a breach of the contract. If there was no breach, that ends the case. If the mill was what it was to be, your inquiry stops right there. But if you find there was a breach of the warranty, that the machinery was not of the power and would not do the work guaranteed, then ascertain the difference between the value of this machinery and the value of the machinery they should have gotten. In looking at the quality of the lumber cut you must bear in mind that it was the duty of the defendants to operate it in a workmanlike manner. If it failed to do the work by reason of their negligence, the plaintiffs are not to suffer on that account,—only because the mill would not do the work warranted to do. Now on this point there is a great deal of evidence. It is claimed by the defendants that this mill was practically of no value to them. Two witnesses were called who testified among other things that if a steam sawmill which would cut from 10,000 to 15,000 feet per day of ten hours was worth $2,200, one that would cut 6,000 feet would be worth only half that amount. That was the testimony of Edward Noon. And the testimony of Moltz was if the one cost $2,200 the other would cost $1,100, and the difference would be between $1,100 and $2,200. He states that the difference in the price of the engine would be something like $200 or $300. Something like that.]

[It will be your duty to ascertain from all the evidence in this case, and consider the whole transaction and ascertain the difference between the value of the machinery, the entire machinery that these parties received, and the machinery which they were entitled under their contract to receive, and whatever that sum is divide it by three, and deduct it from the claim of the plaintiffs in each one of these cases.]

You will have three verdicts, because you are sworn in three causes; so it will be proper to take one third off of each note. There is one claim that is not yet due. In this way, whatever

deductions, each will come up in their proper proportion; and it will leave the one unpaid the proper amount to correspond with the others.

There is no law in dispute in this case that the counsel had any trouble with. They have discussed the case as a, question of fact; and as such it is our duty to plainly lay it before you. This we have done, and we think that fulfils our duty to you. You will consider all the evidence and if there was a break of warranty, then ascertain the difference between the value of the machinery they got and the value of the machinery they were to get; and deduct one third of it from each note.

The verdicts and judgments were for the plaintiffs for $452 in each action.

The assignments of error specified the rulings already mentioned, the portions of the charge inclosed in brackets, and "that the general tenor of the charge inadequately presented the case to the jury, and manifestly misled them as to the true points of inquiry and to the prejudice of the plaintiffs."

*H. T. Ames, T. H. Hammond,* and *M. F. Elliott,* for plaintiffs in error.—Miller was an expert machinist, and it was certainly proper to ask him whether the opening and closing of the ports was a defect easily remedied. The question was not rendered inadmissible by the addition of the words "at slight cost." The plaintiffs were bound to perform their contract; but if they had done so substantially, it was all the law demanded to entitle them to recover. It was the duty of the defendants to have given notice if they did not intend to accept the engine as an entire performance. Danville Bridge Co. v. Pomroy, 15 Pa. 151.

A substantial performance in good faith, however, is sufficient, notwithstanding some unimportant omissions which may be compensated in damages; and more especially is this so when the other party has received and enjoyed the fruit of the labor performed. Albert v. Frick, 1 Pennyp. 132.

The true test of the admissibility of this evidence is, Did it bear on the question of damages? The court decided that the rule of damages was the difference between the market value of the machinery as it should have been, and as it was. To ascertain what that difference was, the plaintiffs had a right to inter-

rogate the witness as to what the defects were, and what it would cost to remedy them.

In Stetson v. Croskey, 52 Pa. 230, evidence was admitted showing what it cost to repair a vessel sold by the defendansts to the plaintiff.

The witness, George F. Wilcox, was an expert. An expert is one who has enjoyed some means of special knowledge or experience. Monongahela Water Co. v. Stewartson, 96 Pa. 436; First Nat. Bank v. Wirebach, 106 Pa. 37.

No rule can be laid down as to the extent of that knowledge. Ardesco Oil Co. v. Gilson, 63 Pa. 152.

While the competency of a witness as an expert rests largely in the discretion of the judge trying the case, it is a discretion which will be reviewed on exception. Delaware & C. Steam Towboat Co. v. Starrs, 69 Pa. 36.

It is a fatal error to confine the attention of the jury to one view of the case, when there is more than one which they should consider. Garrett v. Gonter, 42 Pa. 143, 82 Am. Dec. 498; Parker v. Donaldson, 6 Watts & S. 132; Nieman v. Ward, 1 Watts & S. 82.

When the direction of the court tends to withdraw the attention of the jury from the conflict of testimony, which it was the province of the latter to dispose of, it is error. Bovard v. Christy, 14 Pa. 267.

If a paper subscribed by one of the parties be material to the issue, it must be submitted to the jury. Holmes v. Keitlinger, 4 Yeates, 532.

It has been held that to instruct the jury that there is no evidence of a fact but in the testimony of one witness, if another has given the same testimony, is error. Keeler v. Vantuyle, 6 Pa. 250.

To accept the defendant's view of the case, and practically to withdraw all the plaintiffs' evidence from the consideration of the jury, is error. Bergner v. Thompson, 74 Pa. 168; McClurkan v. Byers, 74 Pa. 405; Madara v. Eversole, 62 Pa. 160.

When there are disputed points in a case, or facts proven from which others may or may not be inferred, it is the duty of the judge to submit them all to the jury without instructions as to what inferences they should adopt or reject. Wenrich v. Heffner, 38 Pa. 207.

There is not a word of evidence, from the beginning to the

close of the case, which we have been able to discover, stating that "the defendants claimed the mill was practically of no value to them." To leave a fact to the jury without any evidence is error. Calvert v. Good, 95 Pa. 65; Egbert v. Payne, 99 Pa. 239; Sartwell v. Wilcox, 20 Pa. 117.

The charge of the court must not submit the decision of facts of which there is no evidence, nor submit as facts averments not proved. Egbert v. Payne, 99 Pa. 239; Cauffman v. Long, 82 Pa. 72.

It must submit all facts of which there is proof to the jury. Burke v. Maxwell, 81 Pa. 139; Fretton v. Karcher, 77 Pa. 423.

It must not submit disputed facts as if proved. Irish v. Smith, 8 Serg. & R. 573, 11 Am. Dec. 648.

It must direct the jury to all material points in the case. Youngman v. Miller, 98 Pa. 196; Raby v. Cell, 85 Pa. 80.

It should review all the facts impartially. Parker v. Donaldson, 6 Watts & S. 132; Nieman v. Ward, 1 Watts & S. 68.

It must state the law of the case accurately. If the whole tendency of the charge is to mislead the jury, it is error. Pennsylvania R. Co. v. Berry, 68 Pa. 272.

*H. C. McCormick* and *S. T. McCormick,* for defendants in error.—The question asked Miller was in effect asking the opinion of the witness upon a state of facts not thus far proven by the defendants in the case, and nowhere subsequently proven even by the plaintiffs. This cannot be done. Rambler v. Tryon, 7 Serg. & R. 90, 10 Am. Dec. 444.

The purpose of cross-examination is to test the truth of the witness as to what he has said, and the party cannot lay his defense before the jury untrammeled by the rules of a direct examination by taking his question on cross-examination. Castor v. Bavington, 2 Watts & S. 505.

Cross-examination must be confined to matters which have been stated in the examination in chief. A party will not be permitted to lead out new matter, constituting his own case, by a cross-examination of his adversary's witness. Jackson v. Litch, 62 Pa. 451; Hopkinson v. Leeds, 78 Pa. 396.

To the same effect is Monongahela Water Co. v. Stewartson, 96 Pa. 436, and Ellmaker v. Buckley, 16 Serg. & R. 72.

Wilcox was not an expert. The admission or rejection of so-called expert testimony is a preliminary question within the

discretion of the court below; and unless it appears that the discretion was abused its exercise is not ground for reversal. Delaware & C. Steam Towboat Co. v. Starrs, 69 Pa. 41; Ardesco Oil Co. v. Gilson, 63 Pa. 146; Minnequa Springs Improv. Co. v. Coon, 10 W. N. C. 502; First Nat. Bank v. Wirebach, 106 Pa. 45; Franklin F. Ins. Co. v. Gruver, 100 Pa. 266.

The charge was a fair presentation of the law and the evidence. The presumption is that no fact was submitted to the jury without evidence, and that the charge was fair; and this presumption must be very clearly rebutted, to induce the supreme court to reverse for such submission or for unfairness in the charge. Gifford v. Gifford, 27 Pa. 202.

Mere omissions of portions of the evidence and even slight misstatements, that evidently have not controlled the verdict, are not regarded as a ground of reversal. Penn Mut. Ins. Co. v. Snyder, 3 W. N. C. 269.

That the court did not comment upon all the evidence, and bring each fact specially to the attention of the jury, which is the subject of complaint in the second and third exceptions, has always been held no reason for reversal. Mershon v. Hood, 2 Pittsb. 207.

PER CURIAM:

No written points were presented to the court. The mere omission to refer to all the evidence is not a sufficient cause for reversing the judgment. The main evidence which controls the case was properly presented to the jury in a correct manner. We see no error in the record.

Judgment affirmed in each case.